# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**Darren Lubbe,**

    Plaintiff,

**v.**

                                **Case No. 1:18-cv-1011-RP**

**Mark Milanovich, Christopher Mulch,
Christopher Brock, Brandon Negri,
Jeff Williams, Thomas G. Ruocco,**

    Defendants

---

## THIRD AMENDED COMPLAINT

NOW COMES Darren A. Lubbe, the Plaintiff herein, alleging and stating as follows:

### Introduction

1.  Under Director Steven McCraw, a "good old boy" culture of cronyism and outright corruption has flourished at the Texas Department of Public Safety ("DPS").  On one hand, policy violations and even crimes have been covered up by DPS when senior commanders or favored personnel (usually Texas Rangers) were involved. On the other hand, senior commanders have forged documents and created rules after the fact in order to punish lower-ranking or disfavored personnel.

2.  The Plaintiff finds himself in the latter category. He was a highly decorated investigator for the Texas Department of Public Safety ("DPS") in 2014 when his captain began pressuring him to attend the captain's "cowboy church." Whereas many of the Plaintiff's colleagues in Mt. Pleasant submitted to the captain's wishes and attended the "cowboy church," the Plaintiff refused, and that triggered an ongoing campaign of harassment from the captain and

his cronies. In 2016, the plaintiff filed a complaint with the Equal Employment Opportunity Office ("EEO") at DPS headquarters in Austin, but that only made things worse. The captain found out about the EEO complaint, and a few months later the Plaintiff received the first negative performance evaluation of his entire career. The Plaintiff was harassed into an early retirement in late 2017, but according to emails obtained by the Plaintiff, senior DPS personnel continued to retaliate *after* his retirement by persuading officials at Texas State University to fire the Plaintiff from a teaching job.  Conversely, the captain was allowed to retire quietly even after DPS investigators confirmed that he had (1) violated the religious freedoms of the Plaintiff and (2) stolen state property.

3.   The Plaintiff did not particularly want to air DPS's "dirty laundry," but enough is enough. The Defendants were sworn to uphold the law, and they thumbed their noses at it. Now it's time to hold them accountable.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiff asserts federal claims under 42 U.S.C. § 1983.

5.   Venue is proper in this Court because some of the Defendants reside in Travis County, Texas.

## PARTIES

6.  Plaintiff Darren Lubbe is a retired special agent with the Criminal Investigation Division ("CID") of the Texas Department of Public Safety ("DPS").

7.  Defendant Mark Milanovich is a retired CID captain who was stationed in Mount Pleasant, Texas.  He was a supervisor in the Plaintiff's chain of command.

8.  Defendant Christopher Mulch is a CID lieutenant stationed in Mount Pleasant, Texas.

9.  Defendant Christopher Brock is a CID special agent stationed in Mount Pleasant,

Texas.

10.  Defendant Brandon Negri is a lieutenant in the DPS Office of Inspector General in Garland, Texas.

11.  Defendant Jeoff Williams is a major and the director of DPS Region 1 in Garland, Texas

12.  Defendant Thomas G. Ruocco, is the chief of the CID division Austin HQ, Texas.

## FACTS

13.  The Plaintiff worked as a CID special agent in Mt. Pleasant, Texas and received numerous awards from DPS and other agencies for his service. While he was working in Mt. Pleasant, his captain (Defendant Milanovich) and lieutenant (Defendant Mulch) repeatedly suggested that there was some impropriety or immorality in the Plaintiff's relationship with his wife.  In 2014, Captain Milanovich began criticizing the Plaintiff's religious devotion and pressuring the Plaintiff to attend the captain's church. Later in 2014, Captain Milanovich stood in the doorway to the Plaintiff's office and invited him to attend his church, making a comment that the Plaintiff would have to attend his church to be "accepted."  The Plaintiff responded by asking Captain Milanovich, "So does that mean that the only way I can be accepted is by going to your church?"  The captain replied, "Yes, you need to come to my church," and the captain seemed aggravated and agitated by the Plaintiff's question. This was ironic, because Captain Milanovich behaved like a foul-mouthed heathen during the week, yet he wanted everyone he worked with to know that he considered himself a devout Christian. The Plaintiff identifies as a Christian, but he had chosen not to join a particular church, and certainly not the captain's "cowboy church." He repeatedly told Captain Milanovich that his relationship with God was between him and God, and he was not interested in joining any church in the area. As set forth herein, Captain Milanovich discriminated against the Plaintiff's First Amendment right to the free exercise of his

religion, and he further violated the Plaintiff's Fourteenth Amendment rights under the Equal

Protection Clause by arbitrarily treating the Plaintiff far worse than those officers who attended

formal church services, and particularly those who attended the captain's church.

26.   In the years that followed, Captain Milanovich imposed double standards on the

Plaintiff, *e.g.*, ordering the Plaintiff to shave his beard even though other undercover agents like

the Plaintiff were permitted to wear beards. In fact, the Plaintiff was the only agent in

Milanovich's district ever told to shave his beard.  The captain constantly harassed and

threatened the Plaintiff about his service on the DPS Special Response Team, so much so that the

Plaintiff ultimately was told by Captain Milanovich to quit the team. The captain also subjected

the Plaintiff to baseless and retaliatory disciplinary write-ups, bullying, intimidation, and

religious harassment.

27.   Some time prior to October 6, 2016, the Plaintiff sought and obtained permission

from his chain of command to replace the tires on his state vehicle. On October 6, 2016, the

Plaintiff returned a tractor and farm truck that he had borrowed from Agent Chris Brock, and

while returning the truck, trailer and tractor, the right rear tire on Agent Brock's farm truck blew

out.  The Plaintiff knew that Discount Tire did not resell the tires and that the tires would be

shredded.  He also knew that no money was exchanged for the used tires nor was there any DPS

policy regarding disposal of the used tires.  On October 7, 2016, the Plaintiff mentioned to Lt.

Mulch that he blew a tire on Agent Brock's personal truck, and that he planned to let Agent

Brock use the old tires from his state vehicle since those tires needed to be replaced before an

upcoming trip to the Mexican border.  Lt. Mulch did not object.  Later that day, the Plaintiff

replaced the tires on his state vehicle and told Agent Brock that he could pick up the old tires at

Discount Tire in Mount Pleasant, Texas.

28.   On October 10, 2016, the Plaintiff visited Captain Milanovich in the captain's office.

The Plaintiff and Milanovich were the only DPS/CID personnel present due to the Columbus Day holiday, and the Plaintiff noticed that two of the four chairs were missing. The chairs were worth about $600 each.  The Plaintiff asked the captain what happened to the chairs, and the captain appeared nervous before admitting, "I took them home." "Fuck the state," he said, "I'm getting mine."  Milanovich then made retaliatory threats against a fellow agent in the Texarkana office. He also told the Plaintiff that he knew how the Plaintiff and the Plaintiff's wife met (insinuating an extramarital affair) and began telling the Plaintiff to start a new life and submit to the Lord.  Captain Milanovich, who was the senior CID captain in the state, said he was angry because he had been passed over for promotion to major. The Plaintiff put the receipt for the purchase of truck tires on his administrative assistant's desk.

29.  On October 12, 2016, Agent Brock had the Plaintiff's old work tires installed on his personal farm vehicle.

30.  After his conversation with the Plaintiff on October 10, 2018, Captain Milanovich became concerned that the Plaintiff might report him for stealing state property.  In an attempt to gain leverage over the Plaintiff, Captain Milanovich confronted him on October 13, 2016 about the price of the new tires and the captain asked the Plaintiff what happened to the old tires. The Plaintiff told Captain Milanovich that Agent Brock now had the old tires, and that Discount Tire wrote on the receipt "save old tires for customer."  The Plaintiff had nothing to hide and knew that he had not violated any law or department policy.  The captain nonetheless ordered the Plaintiff to make sure the used tires were returned to Discount Tire. Within an hour, the Plaintiff texted and placed a phone call to Agent Brock telling him to return the tires immediately per the captain's orders. The captain's office door was open and the Plaintiff spoke loud enough for the captain to hear the conversation.

31.  Later that day, Agent Brock called the Plaintiff, who was headed out of town for a

work assignment on the Mexican border.  Brock said he was not going to return the old DPS

tires, but was planning to return some old tires that Brock had in his barn, and that he intended to

keep the old used tires that had been on the Plaintiff's work vehicle.  Agent Brock said he had

some other old DPS tires in the barn, and knew that other DPS troopers kept old tires and put

them on a personal trailer with permission from their sergeant. The Plaintiff repeatedly told

Agent Brock not to lie, and to do what the captain said.  The Plaintiff knew that Agent Brock had

a documented history of lying and trying to cover things up.

    32.  On October 14, 2016, after repeated calls and directives from Captain Milanovich,

Agent Brock returned the correct tires to Discount Tire.  Later that same day, Lt. Mulch called

the Plaintiff, who was traveling to the Texas/Mexico Border, and asked the Plaintiff to write a

statement about the tires and email it to him by the following Monday, which was October 17,

2016. Lieutenant Mulch also told Agent Brock to do the same.  On October 20, 2016, the

Plaintiff was ordered to return early from his assignment on the border.

    33.  On October 21, 2016, the Plaintiff met with Captain Milanovich, Lt. Mulch, and

Agent Brock for an administrative inquiry. According to a recording of that meeting, Captain

Milanovich suggested that the Plaintiff was not a good enough Christian, that he needed to "get

his heart right with God," and that he needed to go the captain's church. Lt. Mulch never

mentioned the fact that the Plaintiff informed him about his plans to give the old tires to Agent

Brock, and that Lt. Mulch had never objected. The Plaintiff noticed that Captain Milanovich had

returned the stolen chairs before the administrative inquiry, apparently because he recognized his

own hypocrisy.  Captain Milanovich told Agent Brock and the Plaintiff that he believed that

there was no criminal act and that it just looked like bad judgment call and that Milanovich

would talk to Major Jeff Williams about it.

    34.  On the morning of Monday, October 24, 2016, the Plaintiff met with Lt. Mulch in his

- 6 -

office about the bullying, unprofessional conduct, and theft of state property by Captain Milanovich. The Plaintiff also told Lt. Mulch about the years of religious harassment by Captain Milanovich.  After the Plaintiff made the complaint to Lt. Mulch (which DPS policy required Lt. Mulch to report to headquarters), Lt. Mulch asked the Plaintiff, "Are you ready for the battle?" He then attempted to discourage the Plaintiff by saying, "I'm not your salvation." Lt. Mulch appeared to be frightened that the Plaintiff might report Captain Milanovich to higher authorities.

35.  On November 2, 2016, Lt. Mulch, Agent Brock, and the Plaintiff met in Agent Brock's office.  Lt. Mulch told them that a decision should be coming down from the major that day.  After Mulch left, Agent Brock started telling the Plaintiff about all of the double standards and religious hypocrisy by Captain Milanovich.  Agent Brock told the Plaintiff that Captain Milanovich kept DPS all-terrain vehicles and a trailer at his house and farm for personal use (in violation of DPS policy).  Brock also told the Plaintiff that Milanovich had criticized Brock about not going to his (Milanovich's) church and that Brock needed to get his heart right with God. Brock stated to the Plaintiff that he was tired of the religious bullying that had been taking place for the last few years.

36.  On Wednesday evening, November 2, 2016, Captain Milanovich called the Plaintiff, who was getting ready for another special operations border mission.  Captain Milanovich told the Plaintiff that he was not getting a C-1 (formal complaint), but was getting a regional written reprimand and maybe an unscheduled evaluation and that the Plaintiff needed to resign from the Special Response Team (a collateral duty).  The Captain told the Plaintiff to go ahead and go to the border and to tell the Texas Ranger Special Operations Group that this was the Plaintiff's last mission and that the Plaintiff would be resigning.  This devastated the Plaintiff, who had developed considerable expertise in special operations and regularly taught classes on the subject.

37.   On Thursday, November 3rd, 2016, the Plaintiff traveled to the border for his last mission with the Texas Rangers.  Lt. Mulch called the Plaintiff and asked what the Plaintiff's plans were in reference to the outcry that the Plaintiff made to Lt. Mulch about Milanovich, and Lt. Mulch asked if the Plaintiff was going to file a complaint.  The Plaintiff was fearful that Lt. Mulch would warn Captain Milanvoich, so he told Lt. Mulch that he was not going to complain.

38.   On November 14, 2016, the Plaintiff filed a complaint against Captain Milanovich with DPS's Equal Employment Opportunity ("EEO") office.  Afterward, Lt. Mulch called the Plaintiff and said he heard that the Plaintiff had filed an EEO complaint, and he seemed upset with the Plaintiff. The Plaintiff does not know how Lt. Mulch learned about the complaint, which was supposed to be confidential at that point.  The only plausible explanation is that someone inside the Office of Inspector General notified the Plaintiff's chain of command. The Plaintiff told Lt. Mulch that he had to stand up for what was right.  Lt. Mulch told the Plaintiff, "That's why they call it a hard right and easy left," *i.e.*, Mulch suggested that the Plaintiff would regret filing the complaint.

39.   The Plaintiff was interviewed by DPS Office of Inspector General ("OIG") Lieutenant Patrick Heintz on December 22, 2016.  The following February, Lt. Mulch told the Plaintiff, "I hope you're right about this, because if you're not, well.... we will just get along." About a month later, Lt. Mulch told the Plaintiff, "The guys don't trust you," and "I don't know if we can ever get past this." During the December 22, 2016 interview, the Plaintiff told Lt. Heintz that he was tired of the corruption in his office, but he could not transfer because his wife was restricted by a child custody order that prevented her from moving more than three counties away. Defendants Williams, Milanovich, and Mulch were aware of this information, and Defendant Ruocco and DPS Director Steven McCraw later learned about it from the Heintz interview. As set forth below, the Defendants used this information to constructively discharge

the Plaintiff, namely by ordering him transferred far away from Mt. Pleasant.

40.  On March 24, 2017, Lt. Mulch said he was under investigation for failing to report the Plaintiff's religious harassment complaint. Lt. Mulch again told the Plaintiff, "I don't know how we can ever get past this."  Lt. Mulch told the Plaintiff for the third time that it looked like the Plaintiff was retaliating against Captain Milanovich, and that he (*i.e.*, Lt. Mulch) and the captain had since become friends. Prior to that time, Captain Milanovich and Lt. Mulch did not get along with one another.  Lt. Mulch and Agent Brock then drove off together.

41.  In April of 2017, for the first time in his career, the Plaintiff received a negative annual performance evaluation. Lt. Mulch told the Plaintiff again that "the guys" did not trust him and that they thought the Plaintiff was "the enemy."  At that point, the Plaintiff was the most senior agent in the office, had been stationed in Mt. Pleasant since 2004, was highly decorated by DPS, had no previous negative evaluations or written reprimands, was an accomplished investigator, was the 1C District and Statewide Department tactics and medical instructor, and maintained a case load and statistics comparable to the other agents in Mt. Pleasant even though he was absent from the office during approximately 50% of his work hours due to his collateral job duties. Major Jeoff Williams, Captain Milanovich, and Lt. Mulch conspired to falsify (and did falsify) the Plaintiff's annual evaluation in an attempt to retaliate against him for filing the EEO complaint. Major Williams knew that Captain Milanovich was engaged in religious discrimination and favoritism, and he ratified the captain's misconduct by aiding and abetting it. The Plaintiff was immediately cut from all of the collateral and voluntary duties listed above, as well as surveillance duties and assisting other agents in criminal investigations, training, and enforcement action. As a result, the Plaintiff's overtime pay was eliminated.  The Plaintiff was essentially assigned to "desk duty," and he knew that his chain of command was trying to set him up for termination.

42. On June 8, 2017, the Plaintiff was interviewed by Lt. Brandon Negri of OIG.  During that interview, the Plaintiff was shown a copy of a statement wherein Agent Brock claimed that the Plaintiff tried to convince him to keep the old tires from the Plaintiff's state vehicle and instead return some older tires. In other words, Agent Brock lied and tried to blame the Plaintiff for his own scheme to keep the tires from the Plaintiff's vehicle.  At one point, Lt. Negri tried to intimidate the Plaintiff by claiming that the Plaintiff attempted to defraud the state.

43. Lt. Negri expressed little interest in the fact that the Plaintiff had proof of the ongoing religious harassment in Mt. Pleasant. Instead, he was more concerned that the Plaintiff had used an audio recorder to get that proof. "Even though it is not a crime or violation of policy to record your supervisors, I was ordered by headquarters to tell you to stop recording them," Lt. Negri said. "I was told to tell you about the honor code." In other words, DPS commanders didn't mind the Plaintiff recording criminal suspects in the field, but it was a violation of the "honor code" to record criminal suspects who carried a DPS badge.

44. Lt. Negri's statements were the first confirmation that the OIG investigation had been compromised by Director McCraw, Chief Ruocco, and Major Williams.  Whereas the inspector general and her inferior officers are supposed to operate outside the DPS chain of command and report directly to the DPS commission, Lt. Negri was nonetheless relaying orders from DPS "headquarters."  The Plaintiff asked Lt. Negri to report how the Defendants and the EEO process had mistreated him, but instead Lt. Negri buried the complaint. He never even wrote a report about his interview of the Plaintiff.  The Plaintiff alleges that Rhonda Fleming, who was inspector general at the time, would have had a supervisory role in Lt. Negri's "investigation" since it involved a senior commander, yet she failed to prevent Lt. Negri from covering up the retaliation against the Plaintiff.

45. During her tenure at OIG, Ms. Fleming had a policy of protecting senior DPS

commanders, *i.e.*, by covering up their misconduct, and Lt. Negri was acting according to that policy. Former Deputy Inspector General Louis Sanchez will testify that Ms. Fleming covered up misconduct by senior DPS commanders at the expense of lower-ranking personnel like the Plaintiff, and that she did so in collusion with Director McCraw for the purpose of saving DPS from embarrassment.  Mr. Sanchez will further testify that the DPS Commissioners were fully aware of this practice and were deliberately indifferent to it.

46.   On June 22, 2017, while driving his official vehicle, the Plaintiff witnessed a man running out of the woods with what appeared to be an assault rifle, then the man jumped into the passenger side of a waiting vehicle parked on the westbound shoulder of Interstate 30.  The Plaintiff's official vehicle was equipped with emergency lights and siren.  Believing the subject may have committed or was likely to commit a felony, the Plaintiff called dispatch for assistance and location of travel.  With no back up close by, the Plaintiff followed the vehicle into a dead end trailer park and initiated a felony traffic stop.  The Plaintiff activated the red and blue front and rear emergency lights, called in the location and was visually identified by front and rear "state police" markings and body armor.  It was later determined the rifle was a pellet gun, and the Plaintiff released the driver and passengers with no further action.  The Plaintiff reported the incident to Lt. Mulch the following day, June 23rd, 2017.

47.   On July 17, 2017, Lt. Mulch told the Plaintiff, "I am mad at you, but I can't discuss it because of the ongoing administrative investigation." He added, "One day, we will have a couple of beers and talk about it." On the same day, Lt. Mulch gave the Plaintiff a written disciplinary write-up (an "HR-31") for the traffic stop described above stating that the Plaintiff had violated the law and DPS policy.  In reality, the Plaintiff had not violated any laws or DPS policies, and Lt. Mulch did not criticize the traffic stop at the time the Plaintiff reported it.  The Plaintiff later found out that Major Williams, Captain Milanovich, and Lt. Mulch had asked OIG to initiate a

C-1 investigation (*i.e.*, an employee misconduct investigation) of the above incident. OIG returned the complaint to Major Williams, however, explaining that no law or policy had been violated and OIG was not going to get involved.  Again, the Plaintiff was ordered to shave, change his daily dress to business casual, and report daily via email to Lt. Mulch, and he was informally punished and shunned. He was also ordered to take remedial classes designed for problematic employees, and he was directed to complete the classes within one year.

48.  The Plaintiff is aware of similar circumstances wherein CID agents initiated felony traffic stops in plain clothes, but none of those agents were reprimanded or punished.  In 2016, for example, CID Special Agents Danny Kelly and Josh Vera were returning to their Mt. Pleasant duty station when they noticed that they were being followed by a possible outlaw biker group.  Agent Kelly and Vera followed the bikers to their residence and confronted them at gunpoint while Agent Kelly asked them, "You want some of this?"  Agents Kelly and Vera were not identified by police markings or emergency red lights on their state vehicle.  The bikers were not cited or arrested, and Lt. Mulch and Captain Milanovich did not reprimand Agents Kelly and Vera.

49.  On July 21, 2017, Lt. Mulch approached the Plaintiff in his office and said he was going to discuss the Plaintiff's disciplinary write-up (for the aforementioned traffic stop) at an area meeting of CID agents. The Plaintiff responded that Lt. Mulch should not do that, as it would be further retaliation.  The Plaintiff also learned that Agent Brock told another state trooper about the disciplinary write-up, even though the other trooper had no reason to know about it. Agent Brock did this in order to humiliate the Plaintiff and to further the other Defendants' retaliation against the Plaintiff.

50.  On August 1, 2017, the Plaintiff received a second HR-31 regarding the July 21, 2017 traffic stop even though he had already received an HR-31 regarding the incident. Lt.

Mulch said the purpose of the second HR-31 was to "document progress." The Plaintiff, however, researched DPS policy and learned that an HR-31 is not supposed to be used to "document progress" because it is a reprimand. If a DPS Employee receives three HR-31's in a one-year span, he or she can be designated for an unscheduled evaluation and ultimately terminated. In other words, the DPS chain of command was building the pathway for his termination. The second HR-31 also reprimanded the Plaintiff for failing to complete the remedial classes designated in the first HR-31, even though only eleven days had passed since the first HR-31 and the Plaintiff had been given one year to complete the classes.

51. Prior to the August 1, 2017 counseling session, Lt. Mulch asked the Plaintiff how his wife was doing and where was she. The Plaintiff told Lt. Mulch, "She is down in Corpus Christi at a geology camp." Lt. Mulch stated; "Oh, that's right, I saw on her Facebook post. Glad she is where she said she is." Lt. Mulch said this to make the Plaintiff lose his composure, *i.e.*, by suggesting that the Plaintiff's wife was unfaithful and dishonest.

52. On August 10, 2017, the Plaintiff met with Major Williams to report retaliation by the Plaintiff's supervisors. Major Williams told the Plaintiff that it appeared as if the Plaintiff was the one who was retaliating against Captain Milanovich. Major Williams asked the Plaintiff when he was eligible for retirement, and the Plaintiff told him two years. Major Williams told the Plaintiff it would be a "long two years." Major Williams said the Plaintiff no longer had credibility among the people he worked with, and he should consider changing duty stations, *i.e.*, he should transfer out of Major Williams's region.   The Plaintiff told Major Williams that he could not move because his family could not move.  Major Williams told the Plaintiff, "You don't want people following you around," which the Plaintiff understood to be a threat.

53. Toward the end of the August 10, 2017 meeting, Major Williams handed the Plaintiff written notice from Chief Ruocco that he was being suspended for five days without pay and

placed on probation for six months as punishment for the used tire incident. Recall that Captain Milanovich had originally told the Plaintiff that the tire incident was minor and would not result in formal discipline. Thus the Defendants waited until a few months after the Plaintiff filed an EEO complaint – and more than a year after the incident happened – to punish the Defendant for something that they originally acknowledged was not a violation of law or policy. Agent Brock, meanwhile, received only a one-day suspension and six months of probation even after he was caught lying about what happened.

54.  On August 11, 2017, the Plaintiff filed a retaliation complaint against DPS with the U.S. Equal Employment Opportunity Commission ("EEOC") in Dallas. Prior to the filing of that complaint, Defendants Ruocco, Williams, Milanovich, and Mulch had been retaliating against the Plaintiff based on his religious practices (or non-practices). Once they learned about the external EEOC complaint, however, the Defendants doubled down on the retaliation.

55.  On August 22, 2017, the Plaintiff voluntarily took a polygraph test to evaluate whether he was telling the truth regarding the two affidavits and EEO complaints that he filed. (The Plaintiff had repeatedly asked DPS to administer a polygraph, but it never responded to his requests). On that same date, EEOC notified DPS about the Plaintiff's religious discrimination complaint.  The polygraph examiner found that the Plaintiff had been truthful, and those findings were transmitted to OIG/DPS on the same day.  Shortly thereafter, the Plaintiff received a letter dated July 27, 2017 from Chief Ruocco indicating that the Plaintiff's allegations against Captain Milanovich (*i.e.*, that he stole state property and engaged in religious discrimination) had been sustained and that the captain would be punished appropriately. Although the letter was dated July 27, 2017, it was postmarked August 25, 2017.  Chief Ruocco backdated the letter in response to the EEOC complaint and the polygraph results, namely to make it appear that he and Ms. Fleming had already decided to punish Captain Milanovich prior to the EEOC complaint. In

- 14 -

reality, Chief Ruocco and Ms. Fleming were planning to cover up Milanovich's misconduct (recall that the OIG investigator, Lt. Negri, had never even written a report), but the EEOC complaint forced them to abandon the cover-up.

56. On August 30, 2017, the Plaintiff met with Chief Ruocco to appeal his punishment. During that meeting, the Plaintiff provided Chief Ruocco with evidence proving that Captain Milanovich, Lt. Mulch, and Agent Brock lied and falsified government documents. Chief Ruooco responded that their answers were "vague," but he expressed no interest in whether they had violated the law or DPS policy, and that's because he was retaliating against the Plaintiff for filing the EEOC complaint.  Unsurprisingly, the Plaintiff's appeal was overruled.  On September 11, 2017, the Plaintiff sent an email to Director McCraw asking for a final appeal to the director, and that request was approved.

57. On September 12, 2017, the Plaintiff submitted an open records request to support his appeal.  In response to that request, DPS produced some emails, but it failed to produce the June 8, 2017 interview of the Plaintiff by OIG Lt. Brandon Negri.  DPS claimed that the CID chain of command never got a report from Lt. Negri, even though Lt. Negri had documented proof (*i.e.*, audio recordings and corroborating witness statements) of religious harassment.  As noted above, Lt. Negri was supposed to conduct an independent investigation, but instead he conducted a sham investigation and was nothing more than a tool for Ms. Fleming and senior DPS commanders. In other words, he joined the conspiracy to cover up the misconduct of Defendants Ruocco, Williams, Milanovich, Mulch, and Brock.

58. Under the leadership of Ms. Fleming, the entire Office of Inspector General had become the "Office of Damage Control."  Rather than preserve the independence of her office, she allowed it to operate as an arm of Director McCraw and his senior staff, mainly for the purpose of protecting Director McCraw, his senior staff, and their cronies from embarrassment

or unwanted scrutiny. Defendant Fleming knew that her office was conducting sham investigations, including the sham investigation of the Plaintiff's EEO complaint, and she tried to cover up Captain Milanovich's misconduct at the expense of the Plaintiff. She had no interest in preventing retaliation against the Plaintiff, and her office confirmed Captain Milanovich's misconduct (as reflected in Chief Ruocco's backdated letter) only *after* the Plaintiff took his complaint to federal officials. The Plaintiff alleges that Ms. Fleming personally involved herself in the case because of her practice of protecting high-ranking officers.

59.   On September 28, 2017, the Plaintiff and his attorney, Pete Schulte, met at DPS headquarters in Austin with Director McCraw and DPS attorneys. Director McCraw agreed that the Plaintiff's punishment was too harsh and said he did not believe that the incident compromised the Plaintiff's integrity in any way as a CID special agent. The Plaintiff personally informed Defendant McCraw about the campaign or religious harassment and retaliation by Defendants Williams, Milanovich, Mulch and Brock, and Defendant McCraw told the Plaintiff he was "going to find out what the hell is going on in Mt. Pleasant." Defendant McCraw asked to keep the notebook that the Plaintiff prepared, and that notebook outlined all of the evidence of misconduct by Defendants Williams, Milanovich, Mulch and Brock.   A few days later, the Plaintiff was contacted by Lt. Mulch to come to the DPS Mt. Pleasant office, where Captain Milanovich and Lt. Mulch gave him a letter from Director McGraw.  In the letter, the director reduced the Plaintiff's punishment from 5 days off and 6 months probation to one (1) day off and no probation. While this was an improvement, the complaint should have been dismissed outright insofar as the Plaintiff never violated any law or DPS policy. Defendant McCraw sometimes reduces an officer's punishment so that he (*i.e.*, Defendant McCraw) can appear to be the "nice guy" at the top, even as he ultimately sides with senior commanders by maintaining some level of punishment, however unjustified. That is exactly what happened in the Plaintiff's

- 16 -

case.

60.  Notwithstanding the polygraph results, the DPS chain of command ordered the Plaintiff transferred outside of Region 1.  In a letter dated November 3, 2017, Defendant Ruocco wrote that the Paintiff was being transferred (involuntarily) with the approval of Director McCraw. The purpose of the transfer was to force the Plaintiff out of DPS and into retirement. Major Williams had been pressuring the Plaintiff to leave DPS, and he knew that the Plaintiff's family was not able to leave the Mount Pleasant area.  The Plaintiff had told Major Williams about the custody order governing the Plaintiff's stepchildren, and he had likewise told Major Williams that he could not afford the additional cost of two residences, *i.e.*, one for work and one for his family. In other words, Defendant Williams and the chain of command knew that the Plaintiff would be forced to resign rather than transfer. Based on their face-to-face meetings with the Plaintiff, Defendants McCraw and Ruocco knew that Defendants Williams, Milanovich, and Mulch had been retaliating against the Plaintiff for exercising his First Amendment rights. Rather than protect the Plaintiff, however, Defendants McCraw and Ruocco joined in the retaliation by ordering the Plaintiff's transfer. (Given the fact that Director McCraw and Defendant Ruocco had previously sanctioned retaliation against the Plaintiff, the Plaintiff knew that he would still experience retaliation regardless of where he transferred.) As a result, the Plaintiff was forced to retire effective January 31, 2018 (his last work day was December 22, 2017 because of accrued leave time). The Plaintiff had a property interest in his employment pursuant to Texas Government Code §411.007, and the Defendants violated his substantive due process rights by constructively discharging him. Defendant's McCraw and Ruocco were retaliating against the Plaintiff for filing an EEOC complaint and embarrassing the department, ergo they also violated his First Amendment right to petition for redress of grievances.

61.  As a result of his impending retirement, the Plaintiff sought to take on more teaching

responsibilities at Texas State University, where he worked periodically as a contract instructor in the Advanced Law Enforcement Rapid Response Training ("ALERRT") program. On November 30, 2017, the Plaintiff was terminated from ALERRT without warning, even though he still had an active contract with ALERRT. In an email, ALERRT senior regional manager Russ Claggett wrote, "There are concerns about your past performance which have led us to decide not to renew your contract with ALERRT." The reason offered by Mr. Claggett was false and pretextual, as there had never been any issues with the Plaintiff's past performance (and none have been identified to this day). Prior to the November 30, 2017 termination, the Plaintiff had informed ALERRT Director J. Pete Blair, Asst. Director John Curnutt, Mr. Claggett, and regional directorss Marty Adcock, and Armando Ramirez about the ongoing religious discrimination within DPS, further telling them that Defendant Williams (who also served as an ALERRT instructor) had joined the retaliation campaign.

62.  On September 10, 2018, the Plaintiff obtained emails among Blair, Curnutt, Claggett, Adcock, and Ramirez indicating that Major Williams had contacted them and persuaded them to terminate the Plaintiff from ALERRT, purportedly because the Plaintiff lacked credibility and integrity. Major Williams did so in retaliation for the Plaintiff's EEO and EEOC complaints. Defendants Blair, Curnutt, Claggett, Adcock, and Ramirez knew that Major Williams's allegations were false and retaliatory, but they also knew that DPS was one of ALERRT's biggest customers, and that Major Williams could cost ALERRT a lot of business. For that reason, they knowingly joined Major Williams's retaliation campaign and canceled the Plaintiff's teaching contract.

63.  As of late 2017, the Plaintiff had spent a year investigating the case of a sixteen-year-old Wood County girl whose relatives had been trading her for sex in exchange for drugs since she was eleven years old.  Lt. Mulch, Agent Brock and Agent Brian Perry met with Wood

County Sheriff Tom Castloo, Deputy Chief Bobby Sanders, District Attorney Jim Wheeler, and District Attorney's Investigator Jerry Hirsch around that time and told the Wood County officials that the Plaintiff lacked credibility and integrity. Their statements about the Plaintif were false, and they are actionable under the stigma-plus infringement doctrine. Lt. Mulch, Agent Brock, and Agent Perry were acting at the direction of Major Williams and Captain Milanovich.  As a result of their false statements about the Plaintiff, the Wood County DA refused to prosecute the cases.  The Office of Attorney General later filed charges against some of the sex traffickers, but not all.

64.  Around the same time in late 2017, Lt. Mulch and Agent Brock met with Assistant U.S. Attorney Jonathan Ross in Texarkana for the purpose of smearing the Plaintiff's reputation. The Plaintiff had been working a year-long undercover investigation into a large methamphetamine distribution network in Camp County and surrounding areas, but Lt. Mulch and Agent Brock told Mr. Ross that the Plaintiff lacked integrity and credibility. As a result, Mr. Ross initially declined to prosecute the case.  Lt. Mulch and Agent Brock were acting at the direction of Major Williams and Captain Milanovich.

65.  On December 22, 2017, the Plaintiff's last day at work, Captain Milanovich and Lt. Mulch gave the Plaintiff his last performance evaluation, and they omitted and altered facts in order to portray the Plaintiff in a bad light. In other words, even after DPS had sustained the Plaintiff's misconduct allegations against Captain Milanovich, and even after Lt. Mulch got in trouble for failing to report the religious harassment, Director McCraw and Defendants Ruocco and Williams nonetheless allowed the two men to write a false and defamatory performance evaluation of the Plaintiff. Among the false statements in the evaluation were claims that the Plaintiff lacked credibility and was not trusted by his peers. Meanwhile, the DPS administrative assistant in Mt. Pleasant, Sharon Walker, was told by Captain Milanovich that he had no

intention of notifying DPS headquarters about the Plaintiff's retirement. Normally, DPS sends out a department-wide announcement when a trooper or agent retires. Ms. Walker notified headquarters on her own initiative.

66.   After the Plaintiff retired, Captain Milanovich, Lt. Mulch and Agent Brock began retaliating against Ms. Walker because she had cooperated with the OIG investigation and told the truth about how they treated the Plaintiff. In February of 2018, she received her first negative performance evaluation of her 20 years with DPS, and she was subjected baseless and bad-faith criticism from the three men.  She retired two months later because of the stress of working under Captain Milanovich, Lt. Mulch, and Agent Brock.

67.   Although DPS investigators confirmed that Captain Milanovich had stolen state property, retaliated against the Plaintiff, and engaged in religious discrimination, senior commanders nonetheless permitted him to retire quietly in August of 2018 as if nothing had ever happened. Lt. Mulch and Agent Brock, meanwhile, suffered no adverse personnel action whatsoever.

68.   As an example of the DPS Defendants' deliberate indifference to lawlessness and misconduct within DPS, the Plaintiff would direct the Court's attention to  *Billy Spears v. Texas Department of Public Safety, et al.*, Case No. 1:15-cv-511-RP (W.D. Tex.)(hereinafter "*Spears I*") and *Billy Spears v. Steven McCraw, et al.*, Case No. 1:17-cv-1105-RP (W.D. Tex.)(hereinafter "*Spears II*"). In *Spears I*, Trooper Billy Spears reported criminal misconduct by an officer from the Texas Alcoholic Beverage Commission ("TABC"), thereby violating a taboo of DPS culture under Defendant McCraw (*i.e.*, don't file complaints against other law enforcement officers). Rather than commend Trooper Spears, Defendant McCraw disciplined him for exercising his First Amendment right to report the other officer to the TABC.  Soon thereafter, Trooper Spears allowed himself to be photographed with Calvin Broadus, a.k.a.,

"Snoop Dogg," while working security at SXSW in Austin. Defendant McCraw somehow learned about the photograph and personally directed the chain of command to discipline Trooper Spears for allowing himself to be photographed with a "dope-smoking cop hater." Trooper Spears was disciplined even though he violated no policy, and even though other troopers were often photographed with other celebrities (*e.g.*, dope-smoking Willie Nelson) without any consequences. The Commissioners were aware of the incident because it drew national and international attention. Trooper Spears made headlines again when he filed *Spears I*, and the Commissioners were aware of the allegations in that lawsuit because they are routinely briefed about litigation by the Office of Attorney General.

69.   Notwithstanding their actual awareness of the retaliation in *Spears I*, the Commissioners made no effort to reign in Defendant McCraw or his goon squad. While *Spears I* was still pending, senior DPS personnel retaliated further by fabricating a record in Trooper Spears's employee file in an attempt to terminate him. Major Michael Bradberry, the top highway patrol commander for Region 1, personally altered documents in Trooper Spears's personnel file. In October of 2017, Upshur County District Attorney Billy Byrd investigated the forgery and referred it to the Office of the Attorney General ("OAG") for further investigation and/or prosecution. OAG quickly referred the matter back to DPS, even though (1) OAG had its own investigators on staff; (2) DPS had an obvious conflict of interest; and (3) the case easily could have been referred to the district attorney's offices in Travis County or Dallas County. So why was the case referred back to DPS?  Because OAG also wanted to cover up the forgery. As of November 21, 2017, Trooper Spears had filed *Spears II*, wherein he asserted civil claims against the DPS personnel who tried to frame him and fire him.  Those DPS personnel were being defended in federal court by none other than OAG.  Meanwhile, DPS referred the forgery investigation to the Texas Rangers Division, which closed the case *without ever interviewing any*

*of the witnesses*.  The Rangers Division then referred the matter to OIG, even though OIG investigates only violations of DPS policies and procedures, and even though forgery is obviously a crime.

70.   Rather than interview the corroborating witnesses, OIG immediately tried to interview Trooper Spears.  Once again, OIG investigators were doing damage control to protect a senior DPS commander, namely by trying to find out what DPS would be facing in *Spears II*. Trooper Spears's attorney objected to an OIG interview about matters pertaining to his ongoing civil litigation, and OIG relented. Unfortunately, OIG investigators made no effort to interview other witnesses until October of 2018, when Trooper Spears's attorney publicly called for a special prosecutor. Thereafter, OIG personnel kept trying to whitewash the forgery. On or about November 12, 2018, an investigator for the Dallas County District Attorney's Office informally questioned DPS witnesses about the forgery. One week later, OIG Lt. Rick Lopez called one of those witnesses and asked her what the DA investigator had called about. In other words, Lt. Lopez was more concerned about damage control than investigating the forgery. The Commissioner Defendants were personally aware of the forgery and the cover-up because they were Defendants in *Spears II*, but they took no corrective action whatsoever. As usual, they allowed Ms. Fleming and Director McCraw to whitewash a crime by a senior officer, namely Major Bradberry. In 2019, OIG closed its investigation and claimed that it found no violations.

71.   Director McCraw and Commissioners Mach, Flores, Leon, Pulliam, and Watson have adopted an unwritten policy that permits DPS commanders to retaliate against lower-ranking DPS personnel according to their whims and prejudices. DPS has a strong "good old boy" culture that allows DPS commanders to play favorites and create double standards as they see fit. Notwithstanding repeated notice of such unlawful practices – both in litigation and media reports – the Defendants named in this paragraph have demonstrated deliberate indifference.

72. According to Louis Sanchez, Ms. Fleming unlawfully and maliciously discriminated against personnel in the Office of Inspector General. In other words, the person in charge of investigating unlawful employment discrimination at the Department of Public Safety ("DPS") had engaged in unlawful employment discrimination herself (against a military veteran and against another employee who happened to be Defendant Fleming's ex-girlfriend). Mr. Sanchez filed misconduct complaints against her, and Defendant Fleming was allowed to retire quietly in April of 2019. This is standard operating procedure at DPS (also demonstrated by Defendant Milanovich's retirement): when high-ranking DPS officials are caught doing something illegal, they are either transferred or allowed to retire quietly. Mr. Sanchez will testify that such cronyism, favoritism, and corruption were tolerated by Director McCraw and the Commissioner Defendants.

73. Many other witnesses can testify to the culture of cronyism and corruption created by Director McCraw and Ms. Fleming (and tolerated by the Commissioners). In April of 2016, for example, Corporal Katherine Gibson filed a misconduct complaint against Captain Rolando Rivas because he was showing favoritism toward a subordinate, Trooper Diane Martinez, with whom he appeared to be having an inappropriate relationship. OIG initiated an investigation, and within a matter of weeks Captain Rivas began cleaning out his office. At one point, the captain's secretary discovered a note in his office that caused her and other co-workers to fear that Captain Rivas might harm himself. A short time later, however, the chairman of the Texas Senate's Criminal Justice Committee intervened with Director McCraw on behalf of Captain Rivas, and the OIG investigation was quashed. As it happens, Trooper Martinez had boasted about having an intimate relationship with the committee chairman.

74. After Defendant McCraw quashed the investigation, Captain Rivas was allowed to resume his position in Cpl. Gibson's chain of command. Predictably, he began retaliating against

her with numerous bad-faith accusations and disciplinary write-ups. The stress became so severe that Cpl. Gibson sought and obtained medical leave in May of 2017 due to harassment from her chain-of-command. She filed a second misconduct complaint against Captain Rivas in July of 2018, as well as complaints against Lieutenant Glen Lester and Sgt. Rito Morales, because of the ongoing retaliation scheme. Thereafter, Defendant Fleming deliberately slow-walked the investigation, Lieutenant Glen Lester and Sgt. Rito Morales were allowed to transfer and Captain Rivas was allowed to retire. This is standard operating procedure for Director McCraw and Ms. Fleming. When they can no longer cover up misconduct by a senior officer, the investigation is delayed and the senior officer is allowed to retire quietly. By delaying her findings, Ms. Fleming can close the investigation without sustaining any of the allegations. As a result, the report will not be subject to public release, and DPS will be saved from embarrassing revelations.

75. Cpl. Gibson will testify that cronyism and retaliation are systemic within DPS, and that retaliation is particularly common against female officers who report misconduct. In one instance, a former female trooper informed Cpl. Gibson that her estranged husband, a current Lieutenant, had secretly installed DPS surveillance equipment in her vehicle as they were in divorce proceedings. The estranged wife (now ex-wife) tried reporting this to his chain-of-command and OIG, but OIG refused to call her back. Despite clear evidence that the male lieutenant violated DPS policy and committed a crime, OIG refused to investigate and DPS has taken no action against him.

76.   A fatal traffic wreck involving Texas Ranger David Armstrong of Dallas is another example of the favoritism and double standards within DPS.  On February 2, 2017, Ranger Armstrong was returning from a special operations shift on the Mexican border when he crashed his DPS vehicle into a pickup truck, ejecting both the driver and the passenger.  After several weeks, a DPS Highway Patrol accident reconstruction team was able to recover the vehicle's

computer to confirm his speed at the time of the crash.  He was driving 84 miles per hour on Highway 281 in Premont, where the posted speed limit was 45 miles per hour.  Ranger Armstrong fractured his hip, and his DPS vehicle burned down to the metal. The passenger of the other vehicle, 30-year-old JD Kristopher Trevino of Premont, died of his injuries five days after the wreck. Even though the accident occurred in Premont city limits, and even though accidents in municipalities are normally investigated by city police, DPS took over the investigation. Among other things, Ranger Armstrong was violating a DPS safety rule at the time of the accident. That rule mandates that officers working on the border take a six-hour rest period before driving home, and the rule had been in effect for more than a year at the time of the accident. Ranger Armstrong had repeatedly violated the rule  – a fact known to his supervisors – and he was violating it again when he was driving through Premont at 10:15 p.m. Notwithstanding the clear and deadly violations of law and policy, Ranger Armstrong was not disciplined by DPS.

77.  In January of 2018, DPS supervisors discovered that Ranger Brent Davis was involved in an ongoing sexual relationship with Faezeh Pour Mogahdam Horaney of Longview. That might not be noteworthy but for the fact that Ranger Davis was also leading the investigation into the May 30, 2016 murder of Mrs. Horaney's husband, Ronald "Ron" Horaney, a well-known businessman who was gunned down in front of his house.  According to rumors within DPS, Ranger Davis helped Mrs. Horaney recover proceeds from her husband's life insurance policy. Either way, Ranger Davis badly compromised the murder investigation, rendering his testimony worthless at trial and raising questions about whether he diverted investigative attention away from his mistress.  Notwithstanding his gross misconduct and potential criminal activity, he was allowed to keep working for DPS as a law enforcement officer. Senior DPS commanders quietly demoted him from Ranger to trooper, but they told him

that he would be eligible to re-apply for appointment as a Ranger within one year, *i.e.*, as soon as January of 2019.

78.  On February 27, 2017, Ranger Michael Smith was involved in a road rage incident in Round Rock, Texas. After another driver "flipped him off," Ranger Smith initiated a traffic stop and drew his gun on the other driver.  Ranger Smith had no probable cause for the traffic stop, and the driver was released without a citation after Round Rock police responded to the scene. Body camera video from Round Rock officers showed that Ranger Smith lied to the local police while trying to explain what happened.  The incident was kept quiet until July 14, 2017, when Austin television station KXAN broadcast the body camera video and reported inconsistencies in Ranger Smith's story. At the time of the broadcast, DPS issued a written statement that "corrective action" had been taken against Ranger Smith, but he was not demoted at that time, much less terminated (like most other officers would have been). In November of 2018, Ranger Smith was finally demoted from ranger to trooper, most likely because of subsequent misconduct.

79.  In 2011, Senior Ranger Captain Antonio "Tony"" Leal had a traffic accident while driving drunk.  According to the other driver, Leal flashed his badge and offered to pay her if she kept quiet about the wreck. No charges were filed against Leal, and he was allowed to retire as if nothing had happened.  Another ranger was a passenger in Leal's car at the time of the accident, and apparently he was drunk as well.  The other ranger kept quiet about what happened, and he is now one of the top DPS officials in Austin.

80.  Around 2011, Agent Brock wrecked a DPS vehicle in Titus County while driving drunk, but he did not report the incident until the following day, much less the fact that he had been driving drunk. Captain Milanovich learned about the drunk driving incident but helped cover it up, and he prevented Brock from being terminated. In the years before and after, Agent

Brock often called DPS personnel while they were on duty and asked them to drive him home from a bar because he was drunk.  On other occasions, Agent Brock showed up for work with enough alcohol on his breath to be noticed by co-workers and even a local justice of the peace. Prior to the drunk-driving accident, Agent Brock was disciplined for lying about a part-time, off-duty job. He was required by DPS policy to report the job, but he failed to do so and then lied about the job when he was questioned. These facts were reported to OIG investigators and were well known to Agent Brock's supervisors for many years, yet he was never disciplined for his alcohol-related misconduct.

81.  As noted above, the former deputy inspector general will testify to widespread misconduct in DPS and its Office of Inspector General, and he will further attest to the fact that Mr. McCraw, Ms. Fleming, and the Commissioner Defendants knowingly tolerate such lawlessness. Based on that corrupt culture, as well as their high rank, Defendant Williams and Defendant Milanovich knew they would be protected if they discriminated against the Plaintiff. And for the most part, they were protected.

<u>CLAIMS</u>

*42 U.S.C. § 1983*

82.  All Defendants are sued in their individual capacities only, and all prior paragraphs are incorporated herein by reference.

83.  The Plaintiff brings claims for damages against all Defendants under 42 U.S.C. §1983 because they (1) retaliated against him for exercising his rights as guaranteed by the First Amendment to the U.S. Constitution; (2) conspired with other Defendants who retaliated; or (3) failed to supervise those who retaliated. The Defendants retaliated against the Plaintiff after he petitioned for redress of grievances by filing EEO and EEOC complaints, *e.g.*, by imposing baseless disciplinary measures on the Plaintiff. Defendant Negri aided and abetted the retaliation

campaign by covering it up. The Defendants later retaliated by forcing the Plaintiff to take an early retirement, and the retaliation continued when Defendant Williams caused the Plaintiff to lose his teaching contract.

84.   The Plaintiff brings claims for damages against all Defendants under 42 U.S.C. §1983 because they (1) denied him the equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution; (2) conspired with other Defendants who denied his equal protection rights; or (3) failed to supervise those who denied his equal protection rights. The Plaintiff was a member of an identifiable group, namely individuals who did not attend church services. Defendant Milanovich discriminated against the Plaintiff on that basis (*e.g.*, by imposing baseless discipline and forcing the Plaintiff to change his apperance), and Defendants Mulch, Brock, Williams, and Ruocco later participated in the discrimination. Defendant Negri aided and abetted the retaliation campaign by covering it up.

85.   The Plaintiff brings claims for damages against all Defendants  under 42 U.S.C. §1983 because they (1) denied him due process of law as guaranteed by the Fourteenth Amendment to the U.S. Constitution; (2) conspired with other Defendants who denied him due process; or (3) failed to supervise those who denied him due process. Defendants Ruocco and Williams violated the Plaintiff's substantive due process rights by constructively discharging him for arbitrary and capricious reasons. All of the Defendants are liable for one another's torts because they knowingly participated in the larger scheme of retaliation. Defendant Negri aided and abetted the retaliation campaign by covering it up.

## REQUEST FOR RELIEF

86.   The Plaintiff respectfully prays that upon a final hearing of this case, judgment be entered for him against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-

judgment interest at the legal rate; back pay; costs of court; attorney fees; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorney for Plaintiff Darren Lubbe**

## CERTIFICATE OF SERVICE

I certify that I filed a copy of this document with the Court's electronic court filing system on September 17, 2020, which should result in automatic notification to all counsel of record.

**/s/ Ty Clevenger**
Ty Clevenger